## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

———————

| | | |
|---|---|---|
| MICHAEL RAILEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. |
| v. | ) | |
| | ) | |
| EASTPOINTE COMMUNITY | ) | Honorable |
| SCHOOLS AND CHRISTINA | ) | |
| GIBSON, INDIVIDUALLY, | ) | **COMPLAINT AND** |
| | ) | **DEMAND FOR JURY TRIAL** |
| Defendants. | ) | |
| | ) | |
| | ) | |

———————

Jeffrey C. Hart (P69217)
Charissa Huang (P75501)
SMITH HAUGHEY RICE & ROEGGE
Attorneys for Plaintiff
213 S. Ashley Street, Suite 400
Ann Arbor, MI  48104
(248) 417-7829 / (734) 436-0030 (fax)
jhart@shrr.com
chuang@shrr.com

———————

## COMPLAINT

Plaintiff, Michael Railey ("Plaintiff"), brings this action against

Defendants Eastpointe Community Schools ("the School District" or

"ECS") and Christina Gibson ("Defendant Gibson"), collectively ("Defendants") as follows:

## NATURE OF THE CLAIMS

1.     This is an action for declaratory, injunctive, and equitable relief, as well as monetary damages, to redress Defendants' unlawful employment practices against Plaintiff, including its discriminatory treatment, harassment, and the creation of a hostile work environment against Plaintiff due to his race and Defendants' unlawful retaliation against him and wrongful termination after he complained about unlawful race discrimination in the workplace in violation of Section 1981 of the Civil Rights Act of 1866,  42 U.S.C. § 1981 ("Section 1981"), 42 U.S.C. § 1983 (Section 1983), 42 U.S.C. §2000e, et seq., and the Elliott Larsen Civil Rights Act of 1976, MCL § 37.2101.

2.     This action also involves Defendants' violation of: (1) the Michigan Revised School Code MCL § 38.83 by not providing proper written notice of nonrenewal of Plaintiff's contract as the head basketball coach and as a special education teacher after Plaintiff made complaints of racial discrimination, (2) due process violations in the removal of Plaintiff as head basketball coach and special education teacher, (3) First

SHRR\6260159.v1

Amendment violations pursuant to Section 1981 and Section 1983 for the failure to allow discourse about racism and speaking out against racism and corruption, and, (4) violations of Michigan Whistleblowers' Protection Act MCL §15.362 for Plaintiff's reports of racial discrimination, use of evaluations as weapons against black employees, Defendant Gibson's relationship with Mr. Ball, and violations of due process under the existing union rubric and state and Federal law.

## JURISDICTION AND VENUE

3.     The Court has jurisdiction over this action pursuant to 28 U.S. C. §§ 1331 and 1343 as this action involves federal questions regarding deprivation of Plaintiff's rights under 42 U.S.C. § 1981 (Section 1981), 42 U.S.C § 1983 (Section 1983), and Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e, et seq.  The Court has supplemental jurisdiction over Plaintiff's related claims arising under state and local law pursuant to 28 U.S.C. § 1367(a).  The amount in controversy exceeds $5,000,000.

4.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(a) because a substantial part of the events or omissions giving rise to this action, including the unlawful employment practices alleged herein, occurred in the district.

3

## THE PARTIES

5.     Plaintiff, Michael Railey, was a special education teacher and head basketball coach of Eastpointe High School, and at all relevant times has been a resident of the State of Michigan and resides in Detroit, Michigan and met the definition of an "employee" under all applicable statutes.

6.     Defendant, Eastpointe Community Schools, is a school district located in Macomb County, City of Eastpointe, Michigan. At all relevant times Eastpointe Community Schools met the definition of "employer" under all applicable statutes.

7.     Defendant, Christina Gibson, is the Superintendent of Eastpointe Community Schools and upon knowledge and belief Defendant Gibson is a resident of Macomb County, State of Michigan and works at the Eastpointe Community Schools Central Office in the City of Eastpointe, Michigan.

## ADMINISTRATIVE PROCEDURES

8.     Prior to filing of this Complaint, Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission

("EEOC"), alleging violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII").

9.    On September 24, 2024, the EEOC Director Ramiro Gutierrez provided a right to sue letter to Plaintiff requiring his lawsuit be brought within 90-days.

10.    All other prerequisites to the filing of this lawsuit have been met.

## FACTUAL ALLEGATIONS

11.    Plaintiff is a Black male and is therefore within the protected class under the above cited anti-race discrimination statutes, both state and Federal.

12.    Plaintiff has a Bachelor of Science ("BS") in Criminal Justice, a Master's Degree ("MA") in History and Art concentration in African Studies, and a Master's Degree ("MA") in Online Instruction, Teacher Certification Social Studies Secondary Education.

13.    Plaintiff has been an educator for 13 years and a basketball coach even longer.

14.    Plaintiff was employed as a Special Education Teacher and Head Coach of the boys' basketball team at Eastpointe High School.

15.     On February 8, 2024, Plaintiff emailed Julie Alspach, Director of Human Resources, a complaint of racial discrimination informing ECS that Defendant Christina Gibson was engage in race discrimination with racial animus and sought to have the discrimination and hostile work environment investigated and addressed.

16.     The race discrimination began in 2023 when Superintendent Gibson asked then ECS High School Principal Asenath Jones to change Plaintiff's evaluation - seeking to have Plaintiff marked down to minimally effective or lower. Jones refused.  Gibson advised Jones that the only way to get him out of the head basketball position was to "evaluate him out of the position."  Again, Jones refused to change her evaluations of Plaintiff.  ***See Ex. 1 - Declaration of Asenath Jones executed pursuant to 28 U.S.C. §1746.***

17.     Defendant Gibson had Asenath Jones interview potential coaches while Plaintiff remained as head basketball coach, and Gibson required Asenath Jones to interview other coaches that were recommended to Gibson who was a church member of school board members. This occurred while coach Michael Railey was still in the position as head basketball coach.  ***See Ex. 1- Declaration of Asenath***

6

*Jones executed pursuant to 28 U.S.C. §1746.*

18. The race discrimination continued in 2023 when Superintendent Gibson asked the then ECS High School Assistant Principal Fatima Thompson to also change Plaintiff's evaluation - seeking to have Plaintiff marked down to minimally effective or lower. Thompson refused.

19. On April 15, 2024, Plaintiff was terminated from his head basketball coaching job by ECS and Gibson, shortly after winning the district championship. The termination came from Russel Ball, K-12 Athletic and Activities Director ("Athletic Director") and recent hire of Gibson. There has been public discourse in open School Board meetings suggesting Mr. Ball was having an extramarital affair with Gibson and Ball's wife confronted Gibson or attempted to do so. Mr. Ball is no longer employed with ECS having served in his position for less than 9 months.

20. The hearing to remove Plaintiff from his head coaching position was not done in conformity with the due process requirements for such a hearing and was further done without appropriate notice or allowance for representation by Plaintiff's union representative or attorney.

21.   Via email on April 16, 2024, Union President Lincoln Stocks advised Superintendent Gibson that Gibson was incorrect about the appeal process and Plaintiff's appeal rights for the termination hearing were governed under the Collective Bargaining Agreement.

22.   The appeal committee was supposed to be made up of two administrators and two coaches.  None of the black coaches were asked to sit on the committee. One White coach refused to sit on the committee as they knew it was a bogus committee.

23.   On September 9, 2024, Plaintiff spoke at the public open forum portion of the Board of Education meeting stating his position about the racism of Christina Gibson and her use of evaluations in a corrupt and discriminatory manner.

24.   Defendant Christina Gibson has a practice of using evaluations against those who raise complaints of race discrimination with the School District.

25.   On September 17, 2024, with only hours' notice, ECS ordered Plaintiff to attend a meeting with an ECS District lawyer **knowing Plaintiff was represented by counsel** and also knowing Plaintiff had made claims of discrimination against the District and Gibson (White

female) and had filed charges with the EEOC. On the same date Plaintiff informed Stephanie Flemming (HR director) that the hours' notice was insufficient notice for the meeting.

26.   On September 17, 2024, because Plaintiff refused to meet with the ECS district lawyer without his attorney and with only hours' notice, Plaintiff was placed on administrative leave for alleged "insubordination" for not attending the meeting.

27.   On October 4, 2024, ECS notified Plaintiff that his employment contract will be voted for non-renewal on October 8, 2024, i.e., termination of the employment agreement.

28.   Both ECS and Gibson were aware of the claims of race discrimination and violations of due process against ECS and Gibson before making the cognizant decision to adversely affect Plaintiff's employment status.

29.   Both ECS and Gibson are aware that its actions of placing Plaintiff on administrative leave are adverse employment actions.

30.   Both ECS and Gibson are aware that non-renewal of Plaintiff's employment contract are adverse employment actions.

31.   Plaintiff's conduct in engaging in protected employment

activities, i.e., speaking out against race discrimination and violations of Constitutional protections such as violations of due process and violations of free speech protections is a clear and direct causal connection to Plaintiff's exercise of his protected rights and ECS and Gibson's violations thereof.

32.    In two prior race discrimination lawsuits filed against ECS and Gibson, Gibson admitted to using the "N" word under oath at her depositions.

33.    Under oath, former ESC Principal Asenath Jones testified that Gibson used the word "Nigger" in her presence.

34.    Defendant Gibson has a pattern of seeking to have evaluations changed for Black employees of the School District to weaponize the evaluations as a tool for firing Black employees, such as Plaintiff Michael Railey, when they disagree with Gibson and raise claims of racism.  ***See Ex. 1 and Ex. 2.***

35.    Defendant Gibson sought to have Asenath Jones change Plaintiff's evaluation when Jones was the Principal of Eastpointe High School, but Jones refused to do so.  ***Ex. 1 – Declaration of Asenath Jones.***

10

36.    Defendant Gibson admitted in email/text correspondence that she could not terminate Plaintiff with the previous evaluations providing positive statements about Plaintiff and that Gibson needed an "ineffective" or worse evaluation to terminate Plaintiff.

37.    Defendant Gibson also approached Fatima Thompson, Assistant Principal of ECS High School, seeking to have Thompson change Plaintiff's evaluation and admitting her distain for coach Michael Railey.  Thompson refused to change Plaintiff's evaluation to a negative evaluation as requested by Defendant Gibson. ***Ex. 2 – Declaration of Fatima Thompson executed pursuant to 28 U.S.C. §1746.***

38.    Defendant Gibson was able to get her newly appointed Athletic Director, Russel Ball to provide Plaintiff with a negative coaching evaluation, thus allowing for his removal.

39.    Gibson was able to obtain a less than effective evaluation at her behest from the new ECS High School Principal Mr. Yarch in order to terminate Railey from his teaching position as a special education teacher.

40.    The evaluation of Principal Yarch is suspect, not only because Gibson sought to influence the evaluation, but because two agencies

11

overseeing instruction at ECS (including Grand Valley State University) provided glowing evaluations just weeks before Yarch's bogus evaluation of Plaintiff. ***Ex. 3 – Grand Valley State University Evaluation.***

41.   The Central Office or "district administration" is comprised of an entirely White professional staff.  Whereas only one of the principals of the district is Black and more than 85% of the student body is Black.

42.   On October 8, 2024, in violation of the Revised School Code, the Eastpointe School Board ("School Board") is scheduled to wrongfully consider nonrenewal of Plaintiff's employment contract. In anticipation of their vote for non-renewal, Plaintiff brings a wrongful termination claim in the instant complaint.

43.   The School Board's action violates the Revised School Code as the School Board provided Plaintiff with improper notice and no reason for the consideration for nonrenewal except a bogus statement of "insubordination" for not attending a meeting with ECS attorneys with only hours' notice and failing to advise his counsel (or union representative) of said meeting or allowing for the presence of his attorney at the meeting.  Lincoln Stocks Union President requested the meeting be rescheduled when he received the late notice.

12

44.    The Revised School Code requires 30-days advance written notice be provided to the Plaintiff/employee regarding the School Board's consideration of nonrenewal together with a written statement of the reasons the School Board is considering nonrenewal and the opportunity for the Plaintiff/individual to be heard by no less than the full board prior to the consideration for nonrenewal.

45.    Defendants also violated due process and notice requirements of the collective bargaining agreement.

46.    Defendant Gibson's actions of racism, failure to address racism, use of racial slurs including the word "nigger", and weaponizing employment evaluations against Blacks, are all evidence of the ongoing hostile work environment created and fostered by ECS and Gibson under which Plaintiff suffered.

47.    Because of the racism, racial animus, and hostile work environment promoted and fostered by Defendants and due to the extraordinarily egregious work environment, lack of due process, and weaponization of teacher evaluations, Plaintiff brings the following counts against these Defendants.

13

## COUNT I

## Race Discrimination, Retaliation, Wrongful Termination, and Hostile Work Environment Pursuant to 42 U.S.C. §1981 (Section 1981)

48.    Plaintiff realleges paragraphs 1 through 47 as if fully stated herein and adopts by reference each preceding paragraph.

49.    U.S.C. §1981 prohibits discrimination on the basis of race and color in the making and enforcement of contracts. Section 1981 specifically defines the term "make and enforce contracts" to include the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship. Plaintiff was a party to an employment contract with Defendant Eastpointe Community Schools and was to be able to enjoy all benefits, privileges, terms, and conditions of working in the School District free from racial discrimination.    Such contract expectations and benefits include the right to work in an unhampered, nonhostile, nondiscriminatory work environment equivalent to White employees such that Plaintiff's right to contract for employment is not severely abridged and diluted.

50.    As described in preceding paragraphs, Defendants' actions intended to discriminate and did discriminate against Plaintiff when

14

Plaintiff sought to enforce his contract rights to work in an environment without racial discrimination and bigotry. This includes each of the incidents of direct racism by Defendant Gibson using the word "nigger" and directly influencing others to change Plaintiff's evaluations and not providing due process protections to Plaintiff due to his race (Black male). These are but a few examples of the direct evidence of discriminatory animus and intentional racism that disallowed Plaintiff the same protections allowed White employees of the School District under contract.

51.   Defendant Gibson's act of removing Plaintiff from his role as Head Coach of the boys' basketball team and removing him from his job as a special education teacher recommending his contract not be renewed is direct evidence of Defendants' conduct failing to provide full and equal benefit of Plaintiff's contract rights and of all laws and proceedings and further establishes  punishment and treatment of the Plaintiff that is different in kind to the White employees of the District. *__See Ex. 1 an__* *__Ex. 2.__*

52.   Defendants' failure to address discrimination and Defendant Gibson's use of the word "nigger" demonstrates overwhelming deliberate

racism and a hostile work environment created, perpetuated, and condoned by Defendants.

53.   Plaintiff suffered racial discrimination, a hostile work environment, retaliation, and wrongful discharge by Defendants.

54.   Plaintiff suffered emotional distress, humiliation, embarrassment, dishonor, and shame because of Defendants' racial discrimination.

55.   Plaintiff's work and personal reputation has been damaged because of Defendants' wrongful termination and false statements published in his evaluations that Defendant Gibson influenced and demanded and will make it nearly impossible to find employment when Plaintiff had a positive, blemish free work history that has now been irrevocably damaged because of the racially motivated defamatory statements perpetrated by Defendants.

56.   Plaintiff sustained monetary damages including loss of earnings, loss of fringe benefits, and loss of reputation within the educational community.

WHEREFORE, Plaintiff requests that this Court enter judgment in his favor against Defendants for all compensatory damage, exemplary

damages, punitive damages, penalties, treble damages, and equitable and injunctive relief, including, but not limited to a retraction by the School Board of Plaintiff's most recent evaluation and a public apology together with costs, interest, and attorney fees.

## COUNT II

### Race Discrimination, Retaliation, Hostile Work Environment, and Wrongful Termination Under 42 U.S.C. §1983 (Section 1983) and *Jett v. Dallas Independent School District*, 491 U.S. 701, 109 S. Ct. 2702 (1989)

57.     Plaintiff realleges paragraphs 1 through 56 as if fully stated herein and adopts by reference each preceding paragraph.

58.     Section 1983 prohibits the deprivation of any rights, privileges, or immunities secured under the Constitution and laws of the United States.

59.     Plaintiff is a member of a protected class as a Black male.

60.     Based on the preceding paragraphs, Plaintiff was deprived of his right to work in a racism free workplace and was deprived enjoyment of his employment contract pursuant to Section 1981.

61.     Plaintiff was discriminated against, suffered retaliation, and a hostile work environment by Defendants.

62.     Section 1983 is the exclusive remedy for violations of Section

17

1981 by individuals acting in their official capacity as state actors.

63.    Defendants were acting is their official capacity as state actors.

64.    Based on the preceding paragraphs, Defendants created a hostile work environment and retaliated against Plaintiff, which led to his wrongful termination.

65.    Plaintiff sustained a materially adverse change in his condition of employment.

66.    Plaintiff sustained damages including monetary damages, loss of wages, loss of fringe benefits, humiliation, and embarrassment because of the discrimination set forth in the preceding paragraphs.

WHEREFORE, Plaintiff requests that this Court enter judgment in his favor against Defendants for all compensatory damage, exemplary damages, punitive damages, penalties, treble damages, and equitable and injunctive relief, including, but not limited to a retraction by the School Board of Plaintiff's most recent evaluation and a public apology together with costs, interest, and attorney fees.

SHRR\6260159.v1

## COUNT III

## Race Discrimination, Retaliation, Hostile Work Environment, and Wrongful Termination Under Elliott-Larsen Civil Rights Act, MCL §37.2101 et seq. (ELCRA)

67.     Plaintiff realleges paragraphs 1 through 66 as if fully stated herein and adopts by reference each preceding paragraph.

68.     Plaintiff is a Black man and belongs to a protected class within the framework of MCL §37.2101, *et seq.*

69.     Plaintiff experienced racism and opposed racial discrimination in the workplace at Eastpointe Community Schools and raised concerns and made complaints to his superiors including Defendant Gibson, Julie Aspach, Stephanie Fleming, Diane Haack, and to the ECS Board of Education about the racism experienced by Plaintiff and other Black employees.

70.     Plaintiff's speaking out with verbal complaints about racism and with with written statements and complaints furthered created an intimidating, hostile, or offensive work environment.

71.     Plaintiff was subject to adverse employment action, to wit: (1) loss of his job as head basketball coach for the boys' basketball team, (2) receipt of bogus pretextual evaluation after he made complaints of racism

SHRR\6260159.v1

in the district by Defendant Gibson, and (3) a vote of non-renewal of his employment contract when Plaintiff brought complaints of racial discrimination and corrupt practices by Gibson in her use of evaluations, unlike White counterparts. *See Ex. 1 and Ex. 2.*

72.   Prior to participating in meetings and making complaints of racism in the Eastpointe Community Schools Plaintiff had a blemish free employment record with Defendant Eastpointe Community Schools. But after making complaints of racism, Plaintiff was: removed from his head coaching position and his teaching job as a special education teacher, received a pretextual disciplinary writeup for insubordination and a bogus evaluation further exhibiting discrimination and racism at Eastpointe Community Schools unlike encountered by White counterparts. *See Ex. 1 and Ex. 2.*

73.   As described in the preceding paragraphs, the Plaintiff's workplace was permeated with discriminatory intimidation, ridicule, and insult so severe and pervasive that these conditions of his employment created an abusive and hostile working environment.

20

74.     Plaintiff's good faith complaints regarding racism raised the specter of a discrimination complaint, such that it constituted protected activity under the ELCRA.

75.     The bogus disciplinary write-ups and the ultimate decision to vote for nonrenewal of Plaintiff's employment contract were a direct consequence of Plaintiff's complaints of racism and other discriminatory practices.

76.     Defendants' discrimination, creation of a hostile work environment, retaliation, and wrongful termination did cause Plaintiff damages including monetary damages and emotional damages including, but not limited to, emotional distress, humiliation, embarrassment, dishonor, and shame because of Defendants' racial discrimination.

77.     Plaintiff sustained damages and adverse employment action in the form of discipline and termination because of the Plaintiff's complaints (both verbal and written) of the discrimination encountered in the workplace.

78.     Plaintiff was damaged by Defendants' conduct by the loss of his employment and by experiencing public humiliation, embarrassment, emotional distress, and damage to his reputation.

WHEREFORE, Plaintiff requests that this Court enter judgment in his favor against Defendants for all compensatory damage, exemplary damages, punitive damages, penalties, treble damages, and equitable and injunctive relief to which the Court finds Plaintiff entitled, together with costs, interest, and attorney fees.

## COUNT IV

### First Amendment Retaliation Under 42 U.S.C. §1983 (Section 1983)

79.   Plaintiff realleges paragraphs 1 through 78 as if fully stated herein and adopts by reference each preceding paragraph.

80.   Plaintiff engaged in constitutionally protected speech or conduct, including but not limited to, when he made numerous complaints of racism in the district, when he expressed his disgust at the racism and unprofessional manner by which the Board of Education failed to address racism and Gibson's abuse of the evaluation system for terminating Black employees and not White employees.

81.   Adverse action was taken against Plaintiff in the form of discipline and wrongful discharge.

82.    Prior to participating in constitutionally protected speech or conduct, Plaintiff had a blemish free employment record with Defendant Eastpointe Community Schools.

83.    Defendants took adverse action against Plaintiff which was motivated by his protected speech or conduct.

84.    As a result of Defendants' adverse action, Plaintiff lost his employment and experienced public humiliation, embarrassment, emotional distress, and damage to his reputation.

WHEREFORE, Plaintiff requests that this Court enter judgment in his favor against Defendants for all compensatory damage, exemplary damages, punitive damages, penalties, treble damages, equitable and injunctive relief to which the Court finds Plaintiff entitled, including reinstatement of his coaching position and teaching position together with back pay, fringe benefits, and credits toward retirement together with costs, interest, and attorney fees.

## COUNT V

## Breach of Contract

85.    Plaintiff realleges paragraphs 1 through 84 as if fully stated herein and adopts by reference each preceding paragraph.

23

86.     Plaintiff had an employment contract with Defendant Eastpointe Community Schools.

87.     Defendants breached the contract by failing to implement and adhere to the requirements for evaluations set forth in MCL 380.1249. To wit:

Defendants failed to implement MCL §380.1249(1)(c) and MCL §380.1249 (2), which requires:

> (c) …**Beginning July 1, 2024, the performance evaluation system implemented by a school district, intermediate school district, or public school academy under this section must include the rating of teachers as effective, developing, and needing support.**
> **(d) Uses the evaluations, at a minimum, to inform decisions regarding both of the following:**
> (i) The effectiveness of teachers and school administrators, ensuring that they are given ample opportunities for improvement.
> (ii) Development of teachers and school administrators, including providing relevant coaching, instruction support, or professional development.
> (2) The board of a school district or intermediate school district or board of directors of a public school academy **shall ensure that the performance evaluation system for teachers meets at least all of the following:**
> (a) Except as otherwise provided under this subsection, the performance evaluation system must include at least a year-end evaluation for all teachers. The year-end evaluation must meet all of the following:
> (i) Before the 2024-2025 school year, 40% of the year-end evaluation must be based on student growth and assessment data. Beginning in the 2024-2025 school year,

24

the year-end evaluation must include locally agreed-on student growth and assessment data or student learning objectives metrics. The student growth and assessment data or student learning objectives metrics must be collectively bargained, if applicable, as determined under subsection (1)(c). Beginning in the 2024-2025 school year, 20% of the year-end evaluation must be based on student growth and assessment data or student learning objectives metrics.

(ii) The portion of a teacher's year-end evaluation that is not based on student growth and assessment data or student learning objectives metrics, as described under subparagraph (i), must be based primarily on a teacher's performance as measured by the evaluation tool developed or adopted by the school district, intermediate school district, or public school academy under subdivision (e).

(iii) The portion of a teacher's evaluation that is not measured using student growth and assessment data or student learning objectives metrics, as described under subparagraph (i), or using the evaluation tool developed or adopted by the school district, intermediate school district, or public school academy must be based on objective criteria.

(b) The year-end evaluation must include specific performance goals that will assist in improving effectiveness for the next school year and are developed by the school administrator or the school administrator's designee conducting the evaluation, in consultation with the teacher, and any recommended training identified by the school administrator or designee, in consultation with the teacher, that would assist the teacher in meeting these goals. For a teacher described in subdivision (c), the school administrator or designee shall develop, in consultation with the teacher, an individualized development plan that includes these goals and training and is designed to assist the teacher to improve the teacher's effectiveness.

25

(c) The performance evaluation system must include a midyear progress report for a teacher who is in the first year of the probationary period under section 1 of article II of 1937 (Ex Sess) PA 4, MCL 38.81, or who received a rating of minimally effective, ineffective, needing support, or developing in the teacher's most recent year-end evaluation. The midyear progress report must be used as a supplemental tool to gauge a teacher's improvement from the preceding school year and to assist a teacher to improve. All of the following apply to the midyear progress report:

(i) The midyear progress report must be aligned with the teacher's individualized development plan under subdivision (b).

(ii) The midyear progress report must include specific performance goals for the remainder of the school year that are developed by the school administrator conducting the year-end evaluation or the school administrator's designee and any recommended training identified by the school administrator or designee that would assist the teacher in meeting these goals. At the midyear progress report, the school administrator or designee shall develop, in consultation with the teacher, a written improvement plan that includes these goals and training and is designed to assist the teacher to improve the teacher's rating.

(iii) The midyear progress report must not take the place of a year-end evaluation.

(d) The performance evaluation system must include classroom observations to assist in the performance evaluations. All of the following apply to these classroom observations:

(i) A classroom observation must include a review of the teacher's lesson plan and the state curriculum standard being used in the lesson and a review of pupil engagement in the lesson. The items described in this subparagraph must be discussed during a post-

26

observation meeting between the school administrator conducting the observation and the teacher.

(ii) A classroom observation must be not less than 15 minutes but does not have to be for an entire class period.

(iii) There must be at least 2 classroom observations of a teacher in each school year that the teacher is evaluated. One observation may be unscheduled.

(iv) The school administrator responsible for the teacher's performance evaluation shall conduct at least 1 of the observations. Other observations may be conducted by other observers who are trained in the use of the evaluation tool that is used under subdivision (e). These other observers may be teacher leaders.

(v) A school district, intermediate school district, or public school academy shall ensure that, within 30 calendar days after each observation, the teacher is provided with written feedback from the observation.

88. Defendant Eastpointe Community Schools breached the contract by failing to provide 30 days written notice that his contract was not going to be renewed by ECS and failed to implement the required protocols set forth in MCL §380.1249 evaluations.

89. Defendant Eastpointe Community Schools further breached the contract by failing to provide 30 days written notice with the reasons for which his contract was not going to be renewed and failing to address any development plan for the Plaintiff whatsoever, thus making the decision for non-renewal of the employment contract void as capricious and failing to conform with contractual and statutory requirements.

27

90.    Defendant Eastpointe Community Schools had a contractual duty to provide notice and the reasons for nonrenewal but breached said duty by failing to provide the requisite notice and the specific reasons for nonrenewal.

91.    Defendants breached the collective bargaining agreement, specifically Article 5, §12, by not allowing an appropriate appeal after an immediate request was made for an appeal regarding Plaintiff's wrongful termination from his head basketball coaching position.  See below April 16, 2024, email exchange as Union President Lincoln Stocks' statement at 8:54 p.m.:

28

4/29/24, 1:23 PM                                    Eastpointe Community Schools Mail - Termination as Varsity Basketball Coach


EASTPOINTE
COMMUNITY SCHOOLS

Railey, Michael <michael.railey@eastpointeschools.org>

## Termination as Varsity Basketball Coach

7 messages

**Railey, Michael** <michael.railey@eastpointeschools.org>                              Tue, Apr 16, 2024 at 10:53 AM
To: Lincoln Stocks <lincoln.stocks@eastpointeschools.org>, Christina Gibson <christina.gibson@eastpointeschools.org>

I want to make an appeal to the Standing Committee immediately, who do I make the appeal to is it in person or via
correspondence lets get this Ball rolling.

Coach

Michael E. Railey

**Gibson, Christina** <christina.gibson@eastpointeschools.org>                          Tue, Apr 16, 2024 at 3:05 PM
To: "Railey, Michael" <michael.railey@eastpointeschools.org>
Cc: Lincoln Stocks <lincoln.stocks@eastpointeschools.org>, Julie Alspach <julie.alspach@eastpointeschools.org>, Jodi
Center <jcenter@edustaff.org>

Mr. Railey,

As an employee of EDUstaff, the coach, yourself, operates outside the purview of our collective bargaining agreement
and EDUStaff coaches are not considered a member of our district's bargaining unit. Rather, they are engaged as a
contracted employee through a third-party entity.

Given this arrangement, any concerns or decisions regarding your coaching position should be directed to EDUstaff, your
employer when you are working as an athletic coach. We do not hold any obligation to provide due process or
involvement in matters concerning individuals employed through third-party contracts.

Should any further issues arise, it is recommended that they be addressed directly with EDUstaff Human Resources.

C. Gibson

[Quoted text hidden]
--
Christina A. Gibson
Superintendent

EASTPOINTE COMMUNITY SCHOOLS

**Lincoln Stocks** <lincoln.stocks@eastpointeschools.org>                               Tue, Apr 16, 2024 at 8:54 PM
To: "Gibson, Christina" <christina.gibson@eastpointeschools.org>
Cc: "Railey, Michael" <michael.railey@eastpointeschools.org>, Julie Alspach <julie.alspach@eastpointeschools.org>, Jodi
Center <jcenter@edustaff.org>

That is not entirely correct.
Contractually, selection of a non bargaining unit member over a bargaining unit member or the termination of a bargaining
unit member have a right of appeal to a committee as described in article 5 section 12.
This was specifically negotiated when coaches were privatized as a measure to protect and promote bargaining unit
members to remain involved in coaching within the district.
Sincerely,
Lincoln stocks
President EFE

29

92.    Plaintiff sustained damages because of the breaches by Defendant Eastpointe Community Schools and Defendant Gibson including loss of income, loss of fringe benefits and retirement credits, and emotional and reputational damage.

93.    Because of Defendant's breaches, Plaintiff sustained damages including loss of income, loss of fringe benefits, loss of his job security, loss of pension contributions and other damages including emotional damages.

WHEREFORE, Plaintiff requests that this Court enter judgment in his favor against Defendants for all compensatory damage, exemplary damages, punitive damages, penalties, treble damages, equitable and injunctive relief to which the Court finds Plaintiff entitled, including reinstatement of his coaching position and teaching position together with back pay, fringe benefits, and credits toward retirement, together with costs, interest, and attorney fees.

## COUNT VI

## Violation of the Michigan Revised School Code, MCL § 380.1249

94.    Plaintiff realleges paragraphs 1 through 93 as if fully stated herein and adopts by reference each preceding paragraph.

30

95.    Plaintiff is a High School Special Education Teacher, and his contract as a teacher is governed by the Michigan Revised School Code, § 380.1249 (the School Code).

96.    In accordance with the School Code, Plaintiff's evaluation requires, at a minimum, the following in accordance with MCL 380.1249(2)(a)(i) and (b):

> (2) The board of a school district or intermediate school district or board of directors of a public school academy **shall ensure that the performance evaluation system for teachers meets at least all of the following**:
>
> (a) Except as otherwise provided under this subsection, the performance evaluation system must include at least a year-end evaluation for all teachers. The year-end evaluation must meet all of the following:
>
> **(i)    Before the 2024-2025 school year, 40% of the year-end evaluation must be based on student growth and assessment data. Beginning in the 2024-2025 school year, the year-end evaluation must include locally agreed-on student growth and assessment data or student learning objectives metrics. The student growth and assessment data or student learning objectives metrics must be collectively bargained, if applicable, as determined under subsection (1)(c). Beginning in the 2024-2025 school year, 20% of the year-end evaluation must be based on student growth and assessment data or student learning objectives metrics.**

31

(ii)    The portion of a teacher's year-end evaluation that is not based on student growth and assessment data or student learning objectives metrics, as described under subparagraph (i), must be based primarily on a teacher's performance as measured by the evaluation tool developed or adopted by the school district, intermediate school district, or public school academy under subdivision (e).

(iii)   The portion of a teacher's evaluation that is not measured using student growth and assessment data or student learning objectives metrics, as described under subparagraph (i), or using the evaluation tool developed or adopted by the school district, intermediate school district, or public school academy must be based on objective criteria.

(b)  The year-end evaluation must include specific performance goals that will assist in improving effectiveness for the next school year and are developed by the school administrator or the school administrator's designee conducting the evaluation, in consultation with the teacher, and any recommended training identified by the school administrator or designee, in consultation with the teacher, that would assist the teacher in meeting these goals. **For a teacher described in subdivision (c), the school administrator or designee shall develop, in consultation with the teacher, an individualized development plan that includes these goals and training and is designed to assist the teacher to improve the teacher's effectiveness.**

(c)  The performance evaluation system must include a midyear progress report for a teacher who is in the first year of the probationary period under section 1 of article II of 1937 (Ex Sess) PA 4, MCL 38.81, or who received a

32

rating of minimally effective, ineffective, needing support, or developing in the teacher's most recent year-end evaluation. The midyear progress report must be used as a supplemental tool to gauge a teacher's improvement from the preceding school year and to assist a teacher to improve. All of the following apply to the midyear progress report:

    **(i)   The midyear progress report must be aligned with the teacher's individualized development plan under subdivision (b).**

    **(ii)  The midyear progress report must include specific performance goals for the remainder of the school year that are developed by the school administrator conducting the year-end evaluation or the school administrator's designee and any recommended training identified by the school administrator or designee that would assist the teacher in meeting these goals. At the midyear progress report, the school administrator or designee shall develop, in consultation with the teacher, a written improvement plan that includes these goals and training and is designed to assist the teacher to improve the teacher's rating.**

    (iii)  The midyear progress report must not take the place of a year-end evaluation.

(d) The performance evaluation system must include classroom observations to assist in the performance evaluations. All of the following apply to these classroom observations:

(i)     A classroom observation must include a review of the teacher's lesson plan and the state curriculum standard being used in the lesson and a review of pupil engagement in the lesson. The items described in this subparagraph must be discussed during a post-observation meeting between the school administrator conducting the observation and the teacher.

(ii)    A classroom observation must be not less than 15 minutes but does not have to be for an entire class period.

(iii)   There must be at least 2 classroom observations of a teacher in each school year that the teacher is evaluated. One observation may be unscheduled.

(iv) The school administrator responsible for the teacher's performance evaluation shall conduct at least 1 of the observations. Other observations may be conducted by other observers who are trained in the use of the evaluation tool that is used under subdivision (e). These other observers may be teacher leaders.

(v) A school district, intermediate school district, or public school academy shall ensure that, within 30 calendar days after each observation, the teacher is provided with written feedback from the observation.

97.    Here, Plaintiff was not provided with an evaluation as set forth in MCL 380.1249 as required for the 2024-2025 school

year, nor has he been afforded an individual development plan after having received consecutive "effective" evaluations for years 2022 and 2023.

98.   Again, the 2024 sham evaluation received by Plaintiff was after Gibson attempted to gain leverage to terminate Plaintiff after she asked two prior principals/assistant principals to change the evaluation and after Plaintiff had received glowing evaluation form Saginaw Valley State University and others.  ***See Ex. 1 and Ex. 2.***

99.   Plaintiff was not provided 30-days' advance notice by the School Board and all hearings held were in violation of the collective bargaining agreement and state law.

100.  Plaintiff was not provided a written statement setting forth the reasons for nonrenewal before the School Board voted considering nonrenewal.

101.  The Defendants failed to adhere to the School Code and violated Plaintiff's rights under the School Code.

102.   Defendants' failure to abide by the School Code requires that Plaintiff's employment contract be renewed and back pay and fringe benefits be awarded.

103.   Plaintiff was damaged by Defendants acting capriciously and arbitrarily and by Defendants failure to provide notice consistent with the statue and collective bargaining agreement.

104.   Defendants intentionally acted arbitrary and capriciously as Defendant Gibson demanded that the School Board call a special session meeting on October 8, 2024, without proper notice to the union and to the Plaintiff.

WHEREFORE, Plaintiff requests that this Court enter judgment in his favor against Defendants for all compensatory damage, exemplary damages, punitive damages, penalties, treble damages, equitable and injunctive relief to which the Court finds Plaintiff entitled, including reinstatement of his coaching position and teaching position together with back pay, payment of fringe benefits, and credits toward retirement, together with costs, interest, and attorney fees.

SHRR\6260159.v1

## COUNT VII

## Violations of the Whistleblowers' Protection Act, MCL 15.361, et seq.

105.  Plaintiff realleges paragraphs 1 through 104 as if fully stated herein and adopts by reference each preceding paragraph.

106.  Plaintiff spoke out about racism, Defendant Gibson's use of evaluations as a weapon to remove black employees who oppose Gibson, and the affair between Gibson and Russel Ball, and for exercising his rights to confront violations of state and federal law he was wrongfully terminated.

107.  Plaintiff is protected from wrongful termination under the Whistleblower's Protection Act, MCL 15.361 ("WPA") for reporting violations or suspected violations of state, local, or federal law.

108.  Defendants were acting in their official capacity as a public body as a school district and as a superintendent of said school district.

109.  Defendants did violate the WPA by terminating Plaintiff from his head basketball coaching position and as a special education teacher.

110.  Plaintiff sustained damages including loss of his teaching and coaching jobs, loss of pay, loss of benefits and retirement credits, attorney

37

fees, costs, and emotional distress damages including, but not limited to shame, embarrassment, dishonor, and humiliation as a direct result of Defendants wrongful termination in violation of the WPA.

111.  Plaintiff has lost back pay and is seeking injunctive relief including: 1) reinstatement of his teaching and coaching positions; 2) payment of all back fringe benefits and credits toward retirement; 3) a public apology from Defendants; and 4) retraction of his evaluations that are not "effective" in their result.

112.  Based on Defendants wrongful conduct and violations of state and federal discrimination laws, Defendants shall be fined under the WPA.

WHEREFORE, Plaintiff requests that this Court enter judgment in his favor against Defendants for all compensatory damage, exemplary damages, punitive damages, penalties, treble damages, equitable and injunctive relief to which the Court finds Plaintiff entitled, including reinstatement of his coaching position and teaching position together with back pay, fringe benefits, and credits toward retirement, a public apology and retraction of his evaluations together with costs, interest, and attorney fees.

SHRR\6260159.v1

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff demands a trial by jury of the issues in this case.


Dated:  October 11, 2024          By: /s/ *Jeffrey C. Hart*
                                   Jeffrey C. Hart (P69217)
                                   Charissa Huang (P75501)
                                   SMITH HAUGHEY RICE & ROEGGE
                                   Attorneys for Plaintiff
                                   213 S. Ashley Street, Suite 400
                                   Ann Arbor, MI  48104
                                   (248) 417-7829
                                   jhart@shrr.com
                                   chuang@shrr.com

39